**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| FRANK JEFFERS, on his own behalf | ) | |
| and on behalf of all those similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| AMERIPRISE FINANCIAL | ) | |
| SERVICES, INC., RETAIL | ) | |
| PROPERTIES OF AMERICA, INC., | ) | |
| f/k/a INLAND WESTERN RETAIL | ) | |
| REAL ESTATE TRUST, INC., STEVEN | ) | |
| P. GRIMES, ANGELIE M. AMAN, | ) | |
| SHANE C. GARRISON, JAMES W. | ) | |
| KLEIFGES, GERALD M. GORSKI | ) | |
| and RICHARD P. IMPERIALIE, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff FRANK JEFFERS, ("Plaintiff" or "Jeffers") by and through his attorneys, and brings this Class Action Complaint on behalf of himself and all others similarly situated and, except for information based on his own personal knowledge, alleges on information and belief based on the investigation conducted by his counsel and the facts that are a matter of public record, as follows:

## INTRODUCTION

1.     This class action is brought on behalf of investors in the Inland Western Retail Real Estate Trust, Inc. ("Inland Western"), which is now known as Retail Properties of America, Inc. ("RPAI" or "the Company"), against RPAI, its Board of Directors and certain of its executive officers (collectively "Defendants"), and one of the brokers of the trust, Ameriprise

Financial Services, Inc. ("Ameriprise"), for breaching their fiduciary duties to Plaintiff and the proposed class and for violating various laws and guidelines in the sales of this security.

2.       Plaintiff and members of the proposed class purchased shares in Inland Western Retail Real Estate Investment Trust ("Inland REIT" or the "REIT"), a non-public real estate investment trust.

3.       On April 9, 2012, Defendants took Inland REIT public (the "Offering"). In doing so, Defendants made material misrepresentations to Plaintiff and the proposed class.

4.       In addition, Defendants restructured the Company in a manner which materially diluted Plaintiff and the proposed class' investments, causing significant damage.

5.       In addition, Defendant Ameriprise failed to perform required due diligence and failed to disclose fees paid by the other Defendants for its sale of the Offering, breaching its duties to its clients to whom it sold the Offering.

## BACKGROUND

6.       With the contraction of the United States Economy, the Federal Reserve Board has continued to pursue a policy of historically low interest rates. The current rates of interest available to savers are the lowest in the history of the country. Passive investors seeking reasonable risk-adjusted returns have few attractive options.  Individual savers, in particular, have been hard hit because safe investments such as certificates of deposit, money market accounts and corporate bonds offer little return on investment.

7.       These developments have left retirees and other retail investors vulnerable to investment promoters who offer and promise attractive rates of return for what they call "safe investments."

8.       Defendants are in the business of selling investments in real estate investment

trusts, or "REITs."

9.      Most REIT shares are registered for trading on a national securities exchange. Publicly traded REIT shares are widely followed by securities analysts. Their share prices fluctuate with changes in the REIT's portfolio and economic conditions.

10.      Other REITs, such as the Inland REIT prior to the Offering, are referred to as "non-traded REITs," as their shares are not registered for trading on any exchange. Investors in non-traded REITs generally expect to hold their shares for a five to seven year term, with the understanding that the sponsor will seek to list the shares on a national securities exchange. Investors depend on the legitimate operation and accounting of the REIT's business and the sale of properties or listing for the return of their principal.

11.      Investors in non-traded REITs who seek to sell their shares before the end of the term of investment must either resell their shares to the REIT's sponsor or via an inefficient secondary market, usually at severe discounts. Because non-traded REIT shares do not trade in an open market, investors must depend on disclosures made by the sponsors and the sellers for information on the value of the REIT's shares.

12.      Plaintiff and the proposed class invested in the Inland REIT with the understanding that the money they invested with Defendants would be used to pursue the stated investment objectives of Inland REIT: "(1) to make regular distributions to the stockholders; (2) to provide a hedge against inflation by entering into leases which contain clauses for scheduled rent escalations or participation in the growth of tenant sales, permitting them to increase distributions and realize capital appreciation; and (3) to preserve Shareholders' capital."

13.      The offerings in which Plaintiff invested were structured as "blind pool" offerings, in which Plaintiff committed his money before knowing what properties Defendants

would purchase with the net offering proceeds. Plaintiff necessarily depended on the accuracy of Defendants' disclosures about their investment objectives and policies to assess the risks associated with investment.

14.     Inland REIT's initial offering occurred between March 2004 and September 2005. The initial offering price was $10 per share. Defendants revalued Inland REIT's shares for the first time several years later, in December 2009, at $6.85 per share.  Defendants then revalued the shares for a second time in June 2011 to $6.95 per share and reaffirmed this value in Inland Western's February 2012 Form 10K filing with the SEC.  Additionally, Defendants filed a proxy supplement on Form DEFA14A on January 4, 2012, with the SEC in connection with asking Inland REIT's investors to approve a 10-for-1 reverse split and stock dividend in advance of the Offering (the "Recapitalization").  In the proxy supplement, Defendants represented that they expected Inland REIT's shares to be valued at $17.125 per share after the Recapitalization. Defendants' representations regarding the Inland REIT's valuation were incredibly important to its investors given the non-public nature of the REIT.  Those investors relied upon Defendants' representations when making material decisions regarding their investments such as whether to accept or reject occasional tender offers such as one made by CMG Acquisition Co., LLC in October 2011 of $3.50 per share.  Tender offers such as those made by CMG Acquisition Co. directly threatened Defendants' ability to maintain control over the Company.  Thus, there was significant motivation for them to misrepresent the value of the Inland REIT's shares to detract the REIT's investors from tendering.

15.     Contradictory to Defendants' historical representations regarding Inland REIT's valuation, the Company went public with its shares being offered following the Recapitalization

at only $8.00 (as opposed to $17.125). This shocked holders of the REIT, who have suffered significant damages as a result of Defendants' misrepresentations.

16.     By encouraging Plaintiff and the proposed class to repose trust and confidence in Defendants and soliciting their investments in the REIT, Defendants assumed a duty to deal fairly and forthrightly with Plaintiffs and to refrain from engaging in the acts, practices, and courses of conduct described in this complaint. Defendants knew that by their actions they were likely to mislead Plaintiff and the class members and cause financial and other injury to them. By engaging in the actions described in the complaint, Defendants breached and continue to breach their fiduciary duties to Plaintiff and the class members.

## THE PARTICULAR CONDUCT OF AMERIPRISE

17.     In addition to the conduct of Defendant RPAI, Plaintiff and the class were damaged by the actions of Defendant Ameriprise due to its own breaches of duty to its clients.

18.     Ameriprise is a financial consulting firm which acts as a broker dealer under applicable law to invest money on behalf of its clients and then charges a fee for doing so. Ameriprise acts as both advisors to the issuer (Inland Western) and advisor to its retail customers, such as Plaintiff.

19.     Ameriprise employs financial planners and advisors across the United States for this purpose. FINRA regulations have interpreted this dynamic to favor the customer through, at a minimum, clear and transparent disclosure of fees and risk of various investments and strategies.

20.     Ameriprise, its employees, representatives and agents undertake certain responsibilities and the due diligence and fiduciary duties applicable to it are governed by

various state and federal laws, including, but not limited to FINRA Rule 2310, attached hereto as **Exhibit 1** and FINRA Notice 09-09, attached hereto as **Exhibit 2**.

21.     These FINRA rules and notices require broker dealers like Ameriprise to perform certain tasks to determine valuations of the products and the risks inherent to the products, and then inform their clients prior to recommending any product for investment. See **Exhibit 1**, FINRA Rule 2310(b)(3)(A) and (4).

22.     As part of Ameriprise's business model to sell certain securities, which include REITs, Ameriprise crafts private placement memorandums and other offering materials to share with clients and encourage them to invest their money in certain financial products.

23.     In the case of the Inland REIT, those private placement memorandums, offering materials, and oral representations conveyed inconsistent and misleading statements regarding the expected investment returns. In some cases, despite the requirements that placement materials and fact disclosure sheets be presented, Ameriprise failed to present clients with this basic information.

24.     Those documents and statements referenced in paragraph 24 also inaccurately stated how interest was to paid, how the funds in the REIT would be used, and the heightened risks associated with this particular speculative REIT, among other problems.

25.     Further, investors were not informed in any of the materials or statements by Ameriprise, its agents, and employees that substantial conflicts of interest existed as between Ameriprise and its clients due to its relationship with RPAI, f/k/a Inland Western.

26.     Specifically, Inland Western, and later RPAI, paid money to Ameriprise to "push" the Inland REIT in the form of syndication management fees, due diligence fees, and commissions, which were well above industry averages.

27.     Indeed, certain of Ameriprise's own employees were unaware that such excessive fees were being paid but rather were only aware that the Inland REIT was to be aggressively marketed to customers, which demonstrates a systemic failure on the part of management of Ameriprise to disclose the fees to even certain of their own brokers.

28.     The lack of institutional control and disclosure to its own employees represents further violations of FINRA regulations. The system and structure of FINRA is designed on the premise that member firms will regulate themselves. This supervisory obligation begins with the registered representative and runs all the way up the organizational chain. Thus, Defendant does not have the luxury of claiming "lack of knowledge" of the action of its representatives. See NASD Rule 3010(a) and (d)(1), attached as **Exhibit 3**; NASD NOTICE 03-71, attached as **Exhibit 4**; and FINRA NOTICE 10-22, attached as **Exhibit 5**.

29.      Further, Ameriprise retained a continuing duty to its investors to perform due diligence checks on the values of their investments and report those findings to the investors.

30.     As the real estate market cratered and the economy contracted, Ameriprise, as a sophisticated broker dealer with ample personnel for research, knew or should have known that the Inland REIT was becoming desperate to meet its financial obligations. Despite this obligation, Ameriprise continued to push REITs as good investments, maintaining that they provided "reliable" and "significant" income to investors. See Ameriprise Promotion of REITs, attached as **Exhibit 6**.

31.     Ameriprise knew, or should have known, that such financial pressures could or would lead to comingling of investment funds, failures to pay dividends, dividends being paid not on profits but on returned principal, a/k/a "Ponzi scheme," and all other manner of private

placement failures where the seller of such placements attempts to keep investors in the product despite its failing nature.

32. Nevertheless, Ameriprise failed to perform its required duties to determine the true status of the REIT at any point before or during its issuance, despite the fact that Ameriprise has ample experience with failed product placements it has been paid to push.

## JURISDICTION AND VENUE

33. This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), as Plaintiffs and Defendants are either citizens of different states or citizens of a state and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000 exclusive of interests and costs.

34. This action is not a collusive action designed to confer jurisdiction that the Court would otherwise lack.

35. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

36. Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) Defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## THE PARTIES

37.     Plaintiff initially purchased 8,460 interests of Inland REIT at $10.00 per share. Since Plaintiff's initial purchase of shares, Plaintiff has held shares of Inland REIT at all relevant times, as reflected in **Exhibits7-9** attached hereto.  Plaintiff is a citizen of the State of Illinois and a resident of Cook County.

38.     Defendant RPAI, f/k/a Inland Western, is a self-managed REIT focused on the acquisition, development and management of strategically located retail assets.  Its portfolio consists of 301 properties nationally, both wholly and partially owned, totaling in excess of 44 million square feet, including lifestyle, power and community centers, as well as single-tenant net lease properties, in locations demonstrating strong demographics.  RPAI is incorporated in Maryland and is headquartered at 2901 Butterfield Road, Oak Brook, Illinois, 60523.  As such, RPAI is a citizen of the States of Maryland and Illinois.

39.     Defendant Steven P. Grimes ("Grimes") is President, CEO and a director of RPAI.  Grimes was elected to the Board on March 8, 2011.  Grimes has served as Inland Western's CEO and President since October 2009.  Previously, Grimes served as the Company's Chief Operating Officer and Chief Financial Officer since November 2007.  Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided in connection therewith, Defendant Grimes is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct. Defendant Grimes is a citizen of the State of Illinois and a resident of Cook County.

40.     Defendant Angela M. Aman ("Aman") is Inland Western's Executive Vice President, Chief Financial Officer and Treasurer.  She was appointed on December 13, 2011. Due to her experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided in connection therewith, Defendant Aman is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Aman is a citizen of the State of Illinois and a resident of Cook County.

41.     Defendant Shane C. Garrison ("Garrison") is Inland Western's Executive Vice President, Chief Operating Officer, and Chief Investment Officer.  Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided in connection therewith, Defendant Garrison is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Garrison is a citizen of the State of Illinois and a resident of DuPage County.

42.     Defendant James W. Kleifges ("Kleifges") is Inland Western's Executive Vice President and Chief Accounting Officer.  Defendant Kleifges has served in this position since November 15, 2007.  Prior to that time, he served as Chief Accounting Officer of Inland Western Retail Real Estate Advisory Services, Inc., Inland Western's former business manager/advisor. Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information

provided in connection therewith, Defendant Kleifges is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Kleifges is a citizen of the State of Illinois and a resident of DuPage County.

43.     Defendant Gerald M. Gorski ("Gorski") is an Inland Western Director and the Chairman of the Board.  Gorski has been an Inland Western director since July 1, 2003.  He is a member of the Nominating & Corporate Governance Committee.  Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided in connection therewith, Defendant Gorski is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct. Defendant Gorski is a citizen of the State of Illinois and a resident of DuPage County.

44.     Defendant Richard P. Imperialie ("Imperialie") has been an Inland Western Director since January 2008.  He is Chairman of the Nominating and Corporate Governance Committee and a member of the Executive Compensation Committee.  Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided in connection therewith, Defendant Imperialie is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Imperialie is a citizen of the State of Wisconsin and a resident of Racine County.

45.     Defendant Ameriprise is a nationwide financial planner, advisor and broker dealer of securities under applicable FINRA regulations (FINRA CRD# 6363).  Ameriprise is

incorporated in Delaware and has its principal place of business located at 1099 Ameriprise Financial Center, Minneapolis, Minnesota 55474. Ameriprise operates offices throughout the country, including a branch office in Cook County, Illinois. Ameriprise is a citizen of Delaware and Minnesota.

46.     The individual Defendants identified in paragraphs 41-46 are key members of the RPAI Board and/or officers (collectively referred to herein as the "Individual Defendants"). By virtue of their positions as directors and/or officers of RPAI, the Individual Defendants are in a fiduciary relationship with Plaintiff and the other proposed class members, and owe Plaintiff and the proposed class the highest obligation of loyalty, good faith, fair dealing, due care, and full and fair disclosure. Each of the Individual Defendants has, and at all relevant times had, the power to control and influence and did control and influence Inland Western and RPAI to engage in practices complained of herein.

47.     Defendant Ameriprise is also in a fiduciary relationship with Plaintiff and the other proposed class members, and owes Plaintiff and the proposed class the highest obligation of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

48.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company's stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company's stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

49.     Each director and officer of the Company owes to Plaintiff and the proposed class the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and directors, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that valuation of the Company's stock would be based on truthful and accurate information.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and was at all times acting within the course and scope of such agency.

52.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate nor knowingly permit any officer, director or employee of the

Company to violate applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed of how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

53.      Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed to its stockholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and officers of the Company, the absence of good faith on their part and a reckless disregard for their duties to the Company's stockholders. The Individual Defendants were aware or should have been aware that this posed a risk of serious injury to the Company's stockholders.

54.      The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and specifically in connection with the Proposed Transaction.

55.      Similarly, Defendant Ameriprise owed similar fiduciary duties of care and loyalty to the Plaintiff and the proposed class as described above in connection with the proposed transaction and as highlighted in the attached Exhibits.

## CLASS ACTION ALLEGATIONS

56.      Plaintiff brings this action on his own and on behalf of a class consisting of all those who purchased or otherwise acquired shares in the Inland REIT prior to the Offering and were damaged thereby ("Class A"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

57.     Plaintiff further brings this action on his own and on behalf of a sub-class consisting of all those who purchased or otherwise acquired shares in the Inland REIT who were advised or counseled by Ameriprise to acquire the REIT shares or who were sold shares of the Inland REIT by Ameriprise ("Class B").

58.     The members of the Classes are so numerous that joinder of all of them would be impracticable. According to the Company's Form 10-K filed with the SEC for the fiscal year end 2011, Inland Western had over 1,100 stockholders of record which would encompass those investors from Ameriprise.

59.     Plaintiff's claims are typical of the claims of the Classes, because Plaintiff has the same interests as the other members of the Classes and Plaintiff and the other members of the Classes have and will sustain harm arising out of the Individual Defendants' and Ameriprise's breaches of their fiduciary duties. Plaintiff does not have any interests that are adverse or antagonistic to those of the Classes. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

60.     There are questions of law and fact common to the members of Class A that predominate over any questions which, if they exist, may affect individual members of Class A. The predominant questions of law and fact include, among others, whether:

a.      The Defendants have and are breaching their fiduciary duties owed to Plaintiff and Class A; and

b.      Whether Defendants have been unjustly enriched due to their breaches of various duties to Plaintiff and Class A; and

c.  Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.  There are questions of law and fact common to the members of Class B that predominate over any questions which, if they exist, may affect individual members of Class B. The predominant questions of law and fact include, among others, whether:

a.  Ameriprise has and is breaching their fiduciary duties owed to Plaintiff and Class B; and;

b.  Whether Ameriprise has been unjustly enriched due to its breaches of various duties to Plaintiff and Class B; and

c.  Whether Ameriprise failed to comply with applicable regulations regarding excessive fees charged to Plaintiff and Class B; and

d.  Whether Ameriprise failed to conduct proper due diligence as required under the applicable regulations; and

e.  Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Classes that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to

protect their interests. Plaintiff anticipates no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

63.     Since commencing an initial public offering on September 17, 2003, and a subsequent offering on December 28, 2004, Inland REIT has raised net offering proceeds, including merger consideration before offering costs, of over $4.8 billion.   Inland REIT's business model is fundamental. It takes the money raised and acquires the most durable of assets - real estate, a long-lived physical asset with the potential to produce income.   As of December 31, 2007, Inland REIT's portfolio consisted of 180 multitenant shopping centers and 122 freestanding, single-user properties of which 103 are net lease properties. Initially, Inland Western operated a share repurchase program allowing stockholders who wished to cash out of their investment to do so.   However, the Company suspended the program in November 2008, meaning that the only means for stockholders to seek liquidity for their investment was to find a buyer for their shares in a thinly-traded secondary market or accept a tender offer.

**Company Insiders Seek Liquidity**

64.     One of the primary motivators of the Offering was the lack of liquidity in the Company's shares. On November 29, 2009, the Company transferred a portfolio of 55 investment properties and the entities which owned them, into IW, JV, a wholly-owned subsidiary of Inland Western. In connection with a $625 million debt refinancing transaction involving J.P. Morgan Chase Bank, Inland Western raised additional capital of $50 million from a related party, Inland Equity, in exchange for a 23% non-controlling interest in IW JV. Approximately $55 million of net proceeds received from the 2012 Offering was earmarked to

repurchase Inland Equity's interest in IW JV pursuant to a call right contained in IW JV's organizational documents. Inland Equity is owned by certain individuals, including Daniel L. Goodwin ("Goodwin"), who beneficially owned more than 5% of Inland Western's common stock prior to the 2012 Offering, and Robert Parks ("Parks"), who was the Chairman of the Inland Western Board until October 12, 2010, and who now is Chairman of the Board of certain affiliates of The Inland Group, Inc. Management's drive to secure personal benefits and maintain their positions in the Company for themselves was matched by the desire of those who owned what was an illiquid block of shares. This led to ensuing deception of the Company's investors.

### A History of Deception

65.     From time to time tender offers from unaffiliated third parties were received by the Company's stockholders. For example, CMG Acquisition Co, LLC ("CMG") offered Inland Western stockholders $1.50 per share on December 21, 2009. CMG made two subsequent offers of $3.00 per share on May 27, 2011 and $3.50 per share on October 27, 2011. These tender offers directly threatened Defendants' control over the Company and each put their own personal financial interests ahead of Inland Western stockholders. As the chart below highlights, each Individual Defendant has a substantial economic interest in keeping the Company independent:

The following table sets forth information with respect to all compensation paid or earned for services rendered to us by the Named Executive Officers for the years ended December 31, 2010, 2009 and 2008.

| Name and Principal Position | Salary Year | Bonus ($) | Awards ($) | Stock ($) | All Other Compensation (1) ($) | Total ($) |
|---|---|---|---|---|---|---|
| Steven P. Grimes | 2010 | 450,000 | | | | 450,000 |
| Chief Executive Officer, President, | 2009 | 375,000 | — | — | 2,000 | 377,000 |
| Chief Financial Officer and | 2008 | 375,000 | 93,750 | | 1,000 | 469,750 |
| Treasurer | | | | — | | |
| Shane C. Garrison | 2010 | 250,000 | — | —(2) | — | 250,000 |
| Executive Vice President | 2009 | 250,000 | — | — | 2,000 | 252,000 |
| Chief Investment Officer | 2008 | 250,000 | 46,126 | — | 1,232 | 297,358 |
| Niall J. Byrne | 2010 | 250,000 | — | —(2) | — | 250,000 |
| Executive Vice President and President of Property | 2009 | 250,000 | — | — | 2,000 | 252,000 |

| | | | | | |
|---|---|---|---|---|---|
| Management | 2008 | 250,000 | 31,250 | — | 1,825 | 283,075 |
| Dennis K. Holland | 2010 | 265,000 | — | —(2) | — | 265,000 |
| Executive Vice President, | 2009 | 265,000 | 26,500 | — | 2,000 | 293,500 |
| General Counsel and Secretary | 2008 | 265,000 | 26,500 | — | 1,797 | 293,297 |

66.     Thus, Inland Western's stockholders were steered away from each of these offers by the Board, which used Company funds to formally recommend that stockholders reject them. The Board, in doing so, specifically pointed out that each such offer price was substantially below the Company's estimated value per share.

67.     For example, in response to CMG Partners' offer on December 21, 2009, the Company told stockholders that the offer was "substantially below our December 31, 2009, estimated value of $6.85 per share." Just one month later, the Defendants reiterated that the value of the Company's shares was $6.85 in a Form 8-K filing with the SEC. The 8-K stated:

> Qualified plans are required to report account values on an annual basis under the Employee Retirement Income Security Act (ERISA). Solely for this purpose, as of December 31, 2009, our board of directors estimated the ERISA value of shares of Inland Western at $6.85 per share. The estimated value was determined by the use of a combination of different indicators and an internal assessment of value utilizing a common means of valuation under the direct capitalization method as of December 31, 2009. No independent appraisals were obtained. As there is no established public trading market for our shares of common stock, this estimated value may not reflect the actual market value of your shares on any given date; and there can be no assurances that stockholders would receive $6.85 per share for their shares if any such market did exist, that the estimated value reflects the price or prices at which our common stock would or could trade if it were listed on a national stock exchange or included for quotation on a national system, or that stockholders will be able to receive such amount for their shares at any time in the future.

> In conjunction with the estimate of the value of a share of our stock for purposes of the ERISA, our board of directors amended the Distribution Reinvestment Program ("DRP"), effective March 1, 2010, solely to modify the purchase price. This letter is your notification of such amendment. Under the DRP, a stockholder may acquire, from time to time, additional shares of our stock by reinvesting cash distributions payable by us to such stockholder, without incurring any brokerage commission, fees or service charges.

> **Additional shares of Inland Western stock purchased under the DRP on or after March 1, 2010, will be purchased at a price of $6.85 per share.**

[Emphasis in the original]

68.     Then, on June 20, 2011, Defendants increased their valuation (and the price) of

Inland REIT's shares from $6.85 to $6.95. In a Form 8K filed with the SEC the Company stated:

> **What is the new Inland Western estimated share value?**
> The Inland Western estimated per-share value has been established at $6.95. The
> economy and real estate industry remain slow to recover.  The increase from our previous
> estimated per-share value of $6.85 as of December 31, 2009 reflects the slight economic
> recovery since that time while maintaining cautious optimism. This revised estimated
> share value will be communicated to our stockholders in conjunction with the payment of
> the second quarter stockholder distribution of $0.0625 per share, payable on July 11,
> 2011, to stockholders of record at the close of business on June 30, 2011.  This represents
> the **seventh** consecutive quarter-to-quarter increase in distribution rates and equates to a
> 3.6% annualized yield based upon the estimated per-share value of $6.95.

69.     Trusting Defendants' representations regarding the valuation of the Inland

Western shares, it came as no shock to the Company's investors that Defendants urged  them to

reject tender offers that appeared to be significantly below what the Board had informed

stockholders was the true value of their investment.  Thus, just as Defendants urged Inland REIT

stockholders to reject CMG Partners' December 21, 2009 tender, they did so again when CMG

Partners' made a renewed tender offer in October 2011 of $3.50 per share. In a letter to

stockholders, Defendants stated:

> We are aware that you may have received an unsolicited mini-tender offer by CMG
> Partners ("CMG") dated October 27, 2011 to purchase up to 1,000,000 shares of Inland
> Western Retail Real Estate Trust, Inc. ("Inland Western") for a price of $3.50 per share,
> less the amount of any distributions paid to you on or after December 12, 2011. CMG and
> its offer **are not** affiliated with Inland Western.

> The Inland Western Board of Directors has unanimously determined that the offer is not
> in the best interests of the stockholders, as the Board of Directors believes that the value
> of Inland Western shares exceeds the offer price. Although each stockholder has his or
> her individual liquidity needs and must evaluate the offer accordingly, the Board of
> Directors **does not recommend or endorse** CMG's mini-tender offer and suggests that
> stockholders reject the offer and not tender their shares pursuant to the offer. If you wish
> to reject the offer and retain your shares, **no action is necessary.**

70.     Perhaps Defendants most dramatic misrepresentations regarding the value of

Inland REIT's shares were made in connection with the Recapitalization. The seeds of the Offering were planted on December 8, 2010, when the Company issued a proxy statement with the SEC announcing that Inland REIT's stockholders would be asked to approve the initial listing of the Company's common stock. As part of effectuating the Offering, the Company implemented Recapitalization. Under the Recapitalization, the Company effectuated a 10-to-1 reverse stock split. In a January 4, 2011, proxy supplement the Company specifically suggested that the result would be that each share of Inland Western shares would be valued at approximately $17.125 after the stock split and Recapitalization.

71. On February 4, 2011, based in many cases on this misrepresentation, 94.8% of Inland Western stockholders voted in favor of the Recapitalization and pursuing a public listing of the Company's shares. As a result of the reverse stock split and Defendants' representations, investors concluded that each share of Inland REIT stock would have a value of approximately $17 post-Recapitalization. For example, Defendant Ameriprise Financial, one of the world's largest financial advisors, and whose clients have purchased approximately $1.1 Billion of Inland Western, applied a valuation of $17.375 to the Company's shares in its communications with clients based on the representations of Inland REIT and the Inland REIT Board. According to Defendant Ameriprise, during a March 21, 2012, conference call with Defendants to address how the shares would be priced after the reverse stock split and stock dividend in anticipation of the Offering, "management would not confirm the valuation on the call, [but] it did state that there was no material change in the REIT's financial condition and essentially agreed it was reasonable for Ameriprise to use the $17.375 valuation," which it was not and which Defendant Ameriprise knew or should have known at the time of that call. Thus, what happened next, only two days later, was deeply troubling to Plaintiff and the proposed class. This is further evidence

of the failure of Ameriprise to conduct the duties required of it under FINRA regulations.

**The Offering**

72.     On March 23, 2012, the Company filed an amended Form S-11 Registration

Statement with SEC announcing the Offering details and setting a price target for Class A shares

in the Offering of $10-$12. The SEC filing stated:

We are offering 31,800,000 shares of our Class A Common Stock as described in this prospectus. All of the shares of Class A Common Stock offered by this prospectus are being sold by us. **We currently expect the public offering price to be between $10.00 and $12.00 per share.** We have applied to have our Class A Common Stock listed on the New York Stock Exchange, or the NYSE, under the symbol "RPAI". Currently, our Class A Common Stock is not traded on a national securities exchange, and this will be our first listed public offering.

[Emphasis added.]

73.     The $10-$12 offer price represented a deep discount to the $17.125 valuation

Defendants represented to stockholders in February 2011.  Then, on April 5, 2012, about 2

weeks later, RPAI filed a prospectus with the SEC indicating that the public offering price would

be $8.00 per share, considerably below the March 23, 2012, target price range and dramatically

lower than $17.125 per share from Inland REIT's January chart.

74.     The lower valuation was driven largely by the Company's underwriters and

creditors who faced risk of loan default if RPAI was unable to raise capital and from beneficial

owners of Inland Equity and the Inland Group who would directly profit from the capital raised.

As a result of their misrepresentations, omissions and manipulations, the Offering went through

and the true financial state of the Company was finally revealed to its investors.

75.     It has now been revealed that although RPAI is the nation's third largest shopping

center REIT, it has been in financial difficulty since 2005, when it stopped accepting capital.

Defendant Ameriprise knew or should have known this. When the real estate market crashed in

2008, Inland REIT's investment portfolio was overvalued by Defendants.  As such, they could

not bring the Company public for anything near what they had previously represented its value was. As a result, investors, some of whom had originally bought into the REIT at prices as high as $10 per share saw a decline in value of more than 70% when taking into account that the actual split adjusted value of the stock is less than $3 per share. Moreover, investors in the Company were dissuaded from being able to stem their losses in their investment by tendering to third parties such as CMG, whom, at one point, offered Inland REIT investors as much as $3.50 per share.

76.     Typical investors of Inland REIT purchased shares believing it was a safe and secure investing given Defendants representations regarding its investment objectives. Given the nature of a non-public REIT, Inland Western's investors had no choice but to rely upon Defendants' representations regarding the performance Inland REIT. Defendants took advantage of that reliance and actively and affirmatively concealed material underlying facts concerning Inland REIT's properties and the performance of REIT to its stockholders.

**Ameriprise Role in REIT**

77.     Ameriprise, or its agents, employees or subsidiaries, were broker dealers who contracted with Inland Western to solicit investors in the REIT. Ameriprise agreed to sell placements in the REIT by means of Private Placement Memorandum ("PPM") and other selling materials and pitches approved by the Individual Defendants. Ameriprise required Plaintiff and the proposed class of Ameriprise investors to sign uniform subscription agreements stating that they did not rely on information inconsistent with the disclosures set forth in the PPMs in deciding whether to invest in the Inland Western REIT.

78.     Upon information and belief, the PPMs represented that investors in the Inland Western REIT could expect to receive highly attractive rates of return and that their principal

would be fully redeemed. Ameriprise knew, or should have known, that the Inland Western REIT had never performed

at the levels set forth in the PPMs. Mandatory material information such as rates of return and principal protection must be accurate and Ameriprise failed to provide potential investors with this information.

79.     Upon information and belief, Inland Western never published audited financial statements for itself or the Inland Western REIT. The Inland Western REIT was not publicly traded and was purportedly exempt from the registration requirements of the Securities Act of 1933 under SEC Rule 506 of Regulation D. Plaintiff was thus dependent on Ameriprise to conduct an adequate investigation of the Inland Western REIT and Ameriprise was required under applicable FINRA rules to conduct such an investigation. See Exhibit 1.

80.     Upon information and belief, Plaintiff paid "syndication management" fees for managing the offerings. Plaintiff also paid an additional 1% non-accountable "due diligence" fee to Ameriprise. Plaintiff also paid Ameriprise commissions ranging from 7% to 9% for selling the Inland Western REIT.

81.     Upon information and belief, Ameriprise did not use the 1% due diligence fee they collected to conduct independent due diligence. Ameriprise instead relied on the representations of the Individual Defendants which they received from hand-picked materials and orchestrated conference calls from and with the Individual Defendants.

82.     As a result of the fact that Ameriprise did not perform its required due diligence and did not disclose to potential investors certain fees it was earning for selling the REIT. Ameriprise customers were induced into purchasing more than $1,100,000,000.00 (1.1 billion) worth of shares of the REIT from 2004 to 2012. Ameriprise generated over $100,000,000.00

(One hundred million) in fees as a result of these sales.

83.     Defendant Ameriprise's failure to disclose these fees to investors and to some of its own brokers is made more egregious and shows the willfulness of the violation due to the fact that the SEC has previously fined Ameriprise for similar conduct on July 10, 2009, for "undisclosed compensation…in connection with…offer and sale to its brokerage customers of certain real estate investment trusts REITS."

84.     As noted previously *infra*, the Inland Western REIT subsequently ran short of income to pay the required dividend payments and began paying principal back to investors and labeling it as dividends.

85.     As the deceptive acts of Ameriprise caught up to its clients, Ameriprise, rather than informing the clients of the potential cratering of the investment and advising them to sell their shares for what value was available, it instead engaged in further deceit in an attempt to manipulate the value of the shares held by its customers.

86.     As an example, Defendant Ameriprise engaged in Account Statement Identifier Deception (ASID). ASID occurs when an account statement identifier is either added or removed to mislead the investor as to the true nature of the valuation of the purchase price of their investments.

87.     At some point between 2009 and 2012, Defendant Ameriprise changed their account statement identifiers for Account Holdings across the brokerage platform from [Symbol – Description – Quantity – Ending Price – Ending Value – Annual Income – Yield] to [Symbol – Description – Beginning Value – Quantity – Ending Price – Ending Value – Annual Income – Yield], which is represented here:

| Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 |
|---|---|---|---|---|---|---|---|---|
| January, 2007 | | | | | | | | |
| Symbol | Description | Quantity | Ending Price | Ending Value | Cost Basis | Unrealized Gain/Loss | Annual Income | Yield |

| Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 |
|---|---|---|---|---|---|---|---|
| April, 2012 | | | | | | | |
| Symbol | Description | Beginning Value | Quantity | Ending Price | Ending Value | Annual Income | Yield |
| | | | | | | | |

| Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 |
|---|---|---|---|---|---|---|---|---|---|
| June, 2012 | | | | | | | | | |
| Symbol/Cusip | Description | Beginning Value | Quantity | Ending Price | Ending Value | Cost Basis | Unrealized G/L | Annual Income | Yield |
| | | | | | | | | | |

88.     The added term of "Beginning Value" was not, however, what that term reasonably implies. Instead of "Beginning Value" meaning the actual value of an investment holding when it was purchased, the Defendant used this term to indicate what the value of the asset was at the start of that month, which is a nonsensical and arbitrary method of calculating the value and performance of the investment. The prior month's ending balance, which was then indicated as the "Beginning Value" on the statement, created the impression that the investment was better than it actually was.

89.     This deception further created the perception on behalf of the investor that the investor had paid much less for the Inland Western REIT than they actually had due to the markdowns in par value that occurred subsequently. As such, Defendant is continuing to disguise the true nature of the investment loss.

90.     In Plaintiff's case, in January 2007, Plaintiff had approximately $106,966.52 invested in the Inland Western REIT. See Exhibit 7. As of April 2012, however, when Ameriprise used the Beginning Value Identifier, the statement only shows a value of $68,867.76, which would cause Plaintiff to believe that was the only amount initially invested in the REIT. See Exhibit 8. Defendant Ameriprise is intentionally deceiving its own customers into believing that they only invested approximately 75% of what they actually invested.

91.     The purpose of this scheme is to deceive a client into believing  that they actually began with a lesser amount, thus creating the impression that the losses suffered by the REIT were less than what they actually were. This also creates the impression that this highly

speculative product is more stable than it actually is.

92     As noted above, Defendant Ameriprise engaged in further intentional deception or willful ignorance when it allowed Inland Western to recalculate the value of its shares. After legislation was passed forcing Inland Western and other REITs to appropriately revalue and mark down the holdings, Defendant Ameriprise allowed Inland Western to dictate its own valuation in a series of conference calls and correspondence without doing any of the due diligence it collected fees for.

93.     The willful failure to breach this duty to its clients was obviously borne of the desire by Defendant Ameriprise to maintain the artificially high valuations on its account statements to retail customers and further allow it to sell more shares and collect more fees. Defendant's first duty should have been to its customers and not to the REIT or its own profits.

## COUNT I

### (Breach of Fiduciary Duty Against the Individual Defendants)

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     As alleged in detail herein, each of the Individual Defendants had a duty to disseminate accurate, truthful and complete information to Plaintiff and the proposed classes.

96.     The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate materially misleading and inaccurate information to its stockholders through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

## COUNT II
### (Breach of Fiduciary Duty Against Ameriprise)

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     As alleged in detail herein, Defendant Ameriprise, and each of its agents, employees and subsidiaries, had a duty to disseminate accurate, truthful and complete information to Plaintiff and the proposed classes and to perform the required due diligence for which Plaintiff and the proposed class were paying for.

99.     Defendant breached this duty and further breached fiduciary duties placed on it by FINRA regulation, to wit:

FINRA NOTICE 10-22 - Highlights that a broker dealer that is AN AFFILIATE OF AN ISSUER IN A REGULATION D OFFERING MUST ENSURE THAT ITS AFFILIATION DOES NOT COMPROMISE ITS INDEPENDENCE.

See **Exhibit 1**.

100.     Defendant Ameriprise violated its fiduciary duties of care, loyalty, and good faith by allowing the Company to disseminate materially misleading and inaccurate information to its customers through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. Defendant Ameriprise further violated its fiduciary duties by failing to disclose hidden fees it was earning for selling this REIT and for failing to perform the required due diligence that its clients were paying for. These actions could not have been a good faith exercise of prudent business judgment.

## COUNT III
### (Against All Defendants for Unjust Enrichment)

101.     Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

102.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and the proposed class.

103.    Plaintiff, as a stockholder of RPAI, and customer of Defendant Ameriprise, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by them from their wrongful conduct and fiduciary breaches.

**COUNT IV**
**(Aiding and Abetting the Board's Breaches of Fiduciary Duty against RPAI)**

104.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

105.    Defendant RPAI knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the unlawful conduct alleged herein, which, without such aid, would not have occurred.

**COUNT V**
**(Violation of Illinois Securities Law of 1953 – 815 ILCS 5/1, *et seq.* - Ameriprise)**

106.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

107.    Beginning in 2004, Defendant Ameriprise began offering shares of the Inland Western REIT.

108.    The offerings were sold as investments in the real estate held by the REIT which would pay annual dividends.

109.    Defendant Ameriprise was an offeror/seller within the meaning of the Illinois Security Act because it actively solicited the sale of, and sold, the Inland REIT.

110.    Defendant Ameriprise received fees, including commissions and due diligence fees, for its sale of the Inland WREIT to investors. Defendant Ameriprise was motivated, at least in part, by a desire to serve its own financial interests.

111.    As part of the agreements between Ameriprise and Inland Western, Ameriprise made certain representations to its customers regarding the value of the REIT and encouraged its customers to purchase shares of the REIT through promotional materials. Defendant Ameriprise solicited these investments with the understanding that it would receive commissions and fees promised to it by Inland Western and it was in fact paid those fees for each investment in Inland Western that it sold.

112.    Upon information and belief, Defendant Ameriprise required Plaintiff and the Class B members to sign uniform subscription agreements stating that they did not rely on information inconsistent with the disclosures set forth in the PPMs in deciding whether to invest in the Inland REIT.

113.    As a result of the above, Defendant Ameriprise sold over $1,100,000,000.00 (One billion one hundred million) worth of shares in the Inland REIT, and obtained over $100,000,000.00 (one hundred million) in fees paid directly to them for the sale of the REIT.

114.    Defendant Ameriprise acted as a fiduciary to Plaintiff Jeffers and other Class members who purchased Inland REIT shares from Ameriprise and continuously recommended they purchase and hold the same.

115.    Defendant Ameriprise violated the Illinois Securities Law of 1953, 815 ILCS 5/12, *et seq*. in that, in soliciting Plaintiff's investments, as detailed herein, Ameriprise made untrue statements of material fact and omitted material facts necessary to make the statements it did make. In light of the nature of the transaction, these statements were not merely misleading.

116. Upon information and belief, these false and omitted statements were contained in the PPMs for the Inland REIT and the brochures, in addition to other company sponsored content to be given or told to potential investors.

117. Additionally, upon information and belief, Defendant Ameriprise intentionally manipulated the documents indicating the value of the shares in an attempt to conceal the deception and overinflate the perceived value of the shares and minimize the realized losses incurred by Plaintiff and the proposed class, i.e. the ASID deception.

118. Moreover, the Inland REIT were exempt from the registration requirements of securities under Rule 506 of Regulation D of the federal securities laws and were ostensibly sold only to sophisticated investors.

119. Ameriprise is required under federal and state laws and regulations of the Financial Industry Regulatory Authority (FINRA) to conduct a due diligence investigation into each private placement offering they offer and sell to investors. Ameriprise is required to investigate the issuer and the issuer's representations about the offering so they understand the nature of the investment and its risks, and to follow up on any adverse information and any other information that could reasonably be considered a "red flag." Ameriprise is required to disclose to its customers any essential information that Ameriprise does not have about the investment and any risks related to the lack of information.

120. Upon information and belief, Ameriprise did not spend the 1% due diligence fee it collected from Plaintiff and Class members to conduct independent due diligence investigations into the Inland REIT.

121. Information available to Ameriprise demonstrates that Ameriprise knew or should have known that the PPMs, brochures and other company sponsored information related to the

values or predicted results from investment in the REIT were false and misleading. Representatives for Ameriprise visited the Inland Western offices for sales presentations and attended conference calls and Inland Western paid their travel expenses.

122. As noted above, Ameriprise was involved in one conference call wherein the Individual Defendants vastly inflated the share price of the Inland REIT, yet Ameriprise did not check this representation or perform any due diligence to confirm it.

123. Defendant Ameriprise is liable to Plaintiff and the Class B under 815 ILCS 5/13 for rescission or damages and reasonable costs and attorney fees that Plaintiff and the Class suffered in connection with their purchase of the Inland Western REIT.

124. Plaintiff and Class B members have suffered damages in an amount to be proven at trial.

125. Plaintiff, individually and on behalf of all Class B members, hereby tender to Ameriprise the Inland REIT shares that Plaintiff and the Class B continue to own, in return for the consideration paid for those securities together with interest thereon. Class B members who have sold their securities demand damages.

## <u>COUNT VI</u>
**(Violation of Illinois Securities Law of 1953 – 815 ILCS 5/1, *et seq.* – Individual Defendants)**

126. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

127. The Individual Defendants, because of the misrepresentations made in conjunction with the sale of the Inland REIT, are liable under the Illinois Securities Law of 1953, 815 ILCS 5/12, *et seq.*

128. The Individual Defendants were additionally complicit in the fraud perpetrated by Defendant Ameriprise and aided the issuance of fraudulent information both on its own behalf

and in assistance to Defendant Ameriprise.

129.    The Individual Defendants are thus liable to Plaintiff and the Class B under 815 ILCS 5/13 for rescission or damages and reasonable costs and attorney fees that Plaintiff and the Class B suffered in connection with their purchase of the Inland REIT.

130.    Plaintiff and Class B members have suffered damages in an amount to be proven at trial.

131.    Plaintiff, individually and on behalf of all Class B members, hereby tender to Ameriprise the Inland REIT shares that Plaintiff and the Class B continue to own, in return for the consideration paid for those securities together with interest thereon. Class B members who have sold their securities demand damages.

<u>**COUNT VII**</u>
**(Violation of FINRA Regulatory Authority – Ameriprise)**

132.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

133.    FINRA, formerly the NASD, and Defendant's primary federal regulator, has even made all members aware of the risks and extra care to be taken when selling alternative investments such as the private placement REIT at issue here by the following:

> NASD NOTICE 03-71 - In 2003 the NASD observed that retail investors were being offered an array of different investments as alternatives to conventional equity and fixed-income investments.  The notice reminded members of their obligations to, among other things, PROVIDE A BALANCED DISCLOSURE OF BOTH THE RISKS AND REWARDS ASSOCIATED WITH THE PARTICULAR PRODUCT, ESPECIALLY WHEN SELLING TO RETAIL INVESTORS AND IMPLEMENT APPROPRIATE INTERNAL CONTROLS.

> NASD NOTICE 03-71 – Also reminds members that SIMPLY PROVIDING A PROSPECTUS OR OFFERING MEMORANDA DOES NOT CURE UNFAIR OR UNBALANCED SALES OR PROMOTIONAL MATERIALS.

> FINRA NOTICE 09-09 - In 2009 FINRA addressed certain requirements that

apply to the per-share customer account statement values of REIT's and DPP's, products that do not trade on national securities exchanges. In order to provide REASONABLY CURRENT VALUATIONS OF THESE ILLIQUID SECURITIES, NASD Rule 2340 prohibits firms from using a per-share estimated value that has been developed from data more than 18 months old. Firms have this generous 18 month window to use the initial par value on a new offering, after which they need to obtain AN APPRAISAL OF THE PROGRAM'S ASSETS.

FINRA NOTICE 10-22 - With respect to supervision, broker dealers MUST HAVE SUPERVISORY PROCEDURES REASONABLY DESIGNED TO ENSURE THAT EACH REGULATION D OFFERING IS PROPERLY SUPERVISED BEFORE IT IS MARKETED OR SOLD DIRECTLY TO CUSTOMERS. These procedures under NASD Rule 3010 must ENSURE THAT THE FIRM'S PERSONNEL DO NOT VIOLATE FINRA RULES IN CONNECTION WITH THEIR PREPARATION OR DISTRIBUTION OF OFFERING DOCUMENTS OR SALES LITERATURE. The notice is clear that, with respect to Regulation D offerings, supervision goes beyond just the registered representative and extends into the back office to include functions such as due diligence and document circulation.
See Attached Exhibits.

134.     Defendant Ameriprise has ignored virtually all of its primary regulator's notices and rules and regulations as they pertain to the sale of nonconventional, illiquid products such as the Inland REIT.

135.     Defendant Ameriprise solicited and sold Inland REIT from 2004 to 2012; by misleading investors, falsely representing the product to its registered representatives who in turn falsely represented the product to investors, especially with respect to the risks associated with the highly speculative real estate private placement.

136.     The offerings provided a sales commission to broker-dealer Defendant Ameriprise ranging from 7-9% of investor funds, additional 1% due diligence fee, as well as other non-disclosed fees paid by Inland Western.

137.     By Defendant Ameriprise's willful failure to follow the applicable FINRA regulations, Defendant has violated federal law and is subject to damages as proved at trial.

**WHEREFORE,** Plaintiff prays for judgment and relief as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as representative for the Classes under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as counsel for the Classes;

B.     Declaring that Defendants have violated the highlighted federal and state laws and their fiduciary duties to the stockholders who purchased shares of the non-traded Inland REIT prior to the 2012 Offering;

C.     Awarding Plaintiff and members of the Classes their compensatory damages against all Defendants, for all damages sustained as a result of Defendants' wrongful conduct in an amount to be proven at trial;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands trial by jury.

THE CATES LAW FIRM, L.L.C.


By:   /s/  Ryan J. Mahoney              
            Ryan J. Mahoney, #6290113
            David I. Cates, #6289198
            216 West Pointe Drive, Suite A
            Swansea, IL 62226
            Telephone:    618-277-3644
            Facsimile:    618-277-7882
            E-mail:rmahoney@cateslaw.com
                       dcates@catselaw.com


HOLLAND, GROVES, SCHNELLER & STOLZE LLC
Eric D. Holland, #6207110
Kevin D. Wilkins, #6305154
300 North Tucker, Suite 801
St. Louis, MO 63101
Telephone:    314-241-8111
Facsimile:    314-241-5554
E-mail:       eholland@allfela.com
              kwilkins@allfela.com